IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LARRY ROY,                              :
(AIS #192299)
                                        :
     Plaintiff,
                                        :
vs.                                          CIVIL ACTION 11-0694-WS-M
                                        :
CORRECTIONAL MEDICAL
SERVICES, et al.,                       :

     Defendants.                        :

REPORT AND RECOMMENDATION

     Plaintiff, an Alabama prison inmate proceeding pro se and in

forma pauperis filed a Complaint under 42 U.S.C. § 1983.  This action

was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B)

and Local Rule 72.2(c)(4), and is now before the undersigned on the

motion for summary judgment of Defendants, Correctional Medical

Services, Inc. ("CMS"), Dr. Negash Tesemma, Dr. Danilo Judit, Dr.

Pamela Barber, Sylvia Hicks RN, Bridget Wilson, Donny Myers, Debra

Poindexter LPN, Phillip Griffin LPN, Rachel Carnley LPN, and Lisa

Taylor LPN (Docs. 29, 30); and Plaintiff's opposition thereto (Docs.

37, 39).  For the reasons stated below, it is recommended that the

motion for summary judgment of Defendants CMS, Tesemma, Judit,

Barber, Hicks, Wilson, Myers, Poindexter, Griffin, Carnley, and

Taylor be granted and that Plaintiff's action against these

Defendants be dismissed with prejudice.  In addition, it is

1

recommended that Plaintiff's pending motion for a preliminary injunction be denied as moot. (Doc. 36).

## I.   SUMMARY OF FACTUAL ALLEGATIONS

From its review of the record, the Court summarizes the allegations which are material to the issues addressed in this Report and Recommendation.  In October of 2009, while incarcerated at Holman Correctional Facility ("Holman"), Plaintiff alleges that he saw Dr. Tesemma for what Plaintiff considered a "routine semi-annual physical" exam.  (Doc. 1 at 9).   Plaintiff contends that at the time, he was feeling no pain at all.  (Id.).  According to Plaintiff, Dr. Tesemma detected a swelling in Plaintiff's lower abdomen and had Plaintiff transported to the Jackson Hospital in Montgomery, Alabama, to be examined by a urologist, Dr. Newman.  (Id.). Plaintiff states that after running a number of tests, Dr. Newman determined that Plaintiff did not have cancer and prescribed two medications, Augmentin and Hytrin, for an enlarged prostate.  (Id.).

Plaintiff claims that upon his return to Holman he began to feel "extreme" side effects from the medications prescribed by Dr. Newman, namely: nausea, muscle weakness, fatigue and swelling in his arms and legs.  (Id.).  Plaintiff claims that he reported these symptoms to Nurse Taylor but that he was required to return to his cell without medical treatment, and that within a couple of days his condition worsened to include vomiting blood and blood in his urine.  (Id.).

2

Plaintiff claims that throughout October and November, Plaintiff went to the sick call window regarding his health condition, but was denied treatment. (Id.). According to Plaintiff, after approximately 47 days, on or about November 28, 2009, an officer named Capshaw, noticed that Plaintiff's face was "distorted and swollen on the left side" and sent him to the infirmary. (Id. at 10). Plaintiff was examined by two nurses and given an appointment to see Dr. Tesemma two weeks later. (Id.). Plaintiff claims he was suffering, "stomach swollen as though to burst, kidneys were hurting, and he could not eat solid food without throwing it back up." (Id.). According to Plaintiff, he had lost about 20 pounds. (Id.).

When Plaintiff saw Dr. Tesemma, Plaintiff states that Dr. Tesemma advised that he would schedule Plaintiff to see a urologist in Montgomery in two weeks. (Id.). Plaintiff complains that despite his protests that he "would be dead before two weeks," Dr. Tesemma "maliciously" sent Plaintiff back to his cell anyway. (Id.). Plaintiff alleges that he called his family on the night of December 17, 2009, and explained his condition to them. (Id.). According to Plaintiff, his family notified Warden Tony Patterson who then had Plaintiff transported to North Baldwin Medical Center in Bay Minette, Alabama. (Id.). Plaintiff claims that, once at the hospital, he discovered that his major organs were shutting down: "his kidneys had stopped functioning, his liver was completely

3

blocked, and his pancreas was seriously infected." (Id. at 11).
The following morning, Plaintiff states that Dr. Paul operated on
his urethra and inserted a catheter tube into the bladder to enable
urine flow, eliminating the swelling of Plaintiff's lower abdomen.
(Id.).  Plaintiff claims that the doctors at North Baldwin Medical
Center helped him in other ways also, including administering
antibiotics to treat his pancreatitis, "plann[ing] surgery to put
Plaintiff on dialysis to unblock his kidneys," and "order[ing] many
bottles of liquids to be administered intravenously saving
Plaintiff's life." (Id.).

Next, Plaintiff complains that the catheter inserted on
December 17, 2009, was removed too soon by Defendant Nurse Wilson
at the Holman prison infirmary. (Id.).  Plaintiff alleges that the
North Baldwin Medical Center doctor had advised the catheter not be
removed for seven weeks, but that on February 1, 2010, some five weeks
and three days later, Defendant Wilson removed the catheter, and
after several hours of Plaintiff being unable to urinate, Defendant
Wilson, along with Defendant Poindexter attempted to insert a new
catheter. (Id. at 11-12).  Although Plaintiff was feeling relief,
the nurses, according to Plaintiff, thought the urine was flowing
too slow in the new catheter, and thus unsuccessfully attempted to
insert a larger catheter. (Id. at 12).  Defendant Nurse Wilson then
called Dr. Tesemma, who ordered Plaintiff to be transported back to

4

Atmore General Hospital, according to Plaintiff.  (Id.).  Plaintiff
claims that he experienced terrible treatment once at Atmore General
Hospital, while having another urethra operation, enduring much
bleeding and pain.  (Id.).  Despite his cries of pain, Plaintiff
states that the doctor at Atmore General Hospital ordered him
transported back to Holman following his surgery.  (Id.).

The following day, according to Plaintiff, as a result of his
pain, he was sent to Jackson Hospital in Montgomery, Alabama, where
urologist Dr. Newman removed the "hard plastic catheter" and
"replaced it with one far more flexible, effective, and far less
painful."  (Id. at 12-13).  Plaintiff was transported back to see
Dr. Newman on March 3, 2010, for microwave surgery, and had a new
catheter inserted.  (Id. at 13).  Plaintiff was then transported
back to Holman again.  (Id.).  According to Plaintiff, on or about
April 1, 2010, Defendant Dr. Judit, a new doctor employed at Holman,
wanted to change his catheter but did not when instructed by urologist
Dr. Newman to wait for two additional weeks.  (Id.).

On April 14, 2010, Plaintiff claims that Defendants Phillip
Griffin and Rachel Carnley removed his catheter and attempted to
insert a new catheter but were unable to push it past the "microwave
tunnel" operation performed by Dr. Newman.  (Id.).  Plaintiff
states that when Defendants Griffin and Carnley "inflated the
'balloon tip' right into the operated area…solid blood began flowing

5

in the urine bag, but no urine, and Plaintiff was in excruciating pain." (Id.). According to Plaintiff, Defendants Griffin and Carnley sent him back to his cell with blood flowing but no urine. (Id.). Plaintiff returned to the prison infirmary and complained to Sylvia Hicks, but was sent back to his cell. (Id.). Plaintiff then asked an officer to call the doctor, and Plaintiff was returned to the infirmary. (Id.).

Once back at the infirmary, Defendant Dr. Judit examined Plaintiff and removed the catheter. (Id. at 14). Plaintiff complains that Dr. Judit then wiped the blood off of the catheter and reinserted the same catheter, which stopped again at the restricted area. (Id.). Dr. Judit also inflated the balloon tip into the "operated area, not into the bladder." (Id.). "Solid blood was flowing, and it was painful." (Id.). Plaintiff also states that his abdomen was full of pressure from not having urinated the entire day. (Id.). Plaintiff also complains that Defendants Griffin, Carnley, and Dr. Judit had not scrubbed their hands, or taken any antiseptic precautions other than using surgical gloves while seeking to insert his catheter. (Id.). Plaintiff claims that, as a result, he suffered a urinary tract infection. (Id.).

On April 15, 2010, according to Plaintiff, Defendants had Plaintiff transported to the North Baldwin Emergency room where Plaintiff claims to have "suffered another near death experience at

the hands of the Defendants wherein due to their negligence and malicious indifference, ignoring the orders of the urologist specialist, again Plaintiff's major organs (liver, kidney, and pancreas) had been blocked, infected, and flowing backwards…" (Id.).  Plaintiff states that the doctor at the hospital prescribed an antibiotic and inserted a new catheter in Plaintiff, saving his life.  (Id.).

According to Plaintiff, on or about September 25, 2011, Plaintiff complained to Defendant Dr. Barber that he was experiencing burning sensations, as well as other symptoms.  (Id. at 15).  Again, according to Plaintiff, on October 7, 2011, Plaintiff alerted Dr. Barber to this matter, pointing out that the catheter had been placed in him on June 15, 2011, and needed to be changed because it would stop up periodically.  (Id.).  Plaintiff claims that Defendant Dr. Barber continued to do nothing and the catheter became blocked solid. (Id.).  On October 14, 2011, seven days later, Dr. Barber instructed a nurse to change the catheter.  (Id. at 16).  Plaintiff notes that the nurse, upon seeing that the catheter was too small, drove to Mobile, Alabama, to purchase a larger one.  (Id.).

Plaintiff further states as follows:

> From two years back (2009) on through the
> present time, Plaintiff has been transported
> back and forth to the several hospitals
> undergoing surgeries that damaged the urethra,
> and treatments for urinary infections, and has

7

>been repeatedly in excruciating pain and
>life-threatening condition again and again –
>all originating in the fact that the Defendants
>were deliberately indifferent for forty-seven
>days when Plaintiff was having allergic
>reactions to those medications that ultimately
>damaged his bodily organs which to this day has
>not been repaired (sic).  Plaintiff's physical
>condition, his times of excruciating pain, his
>shame and embarrassment, his psychological
>injury and mental anguish were all later
>compounded again and again by the acts of the
>Defendants, sometimes maliciously done as
>described above, including having become
>infected by the Defendant's unsanitary
>negligence and reckless disregard of correct
>medical safeguards.

(Id. at 14-15).

Medical records submitted to this Court reflect extensive

medical treatment administered to Plaintiff during his incarceration

at Holman.  (Doc. 29, atts. 2-7).  Specifically as to the

"forty-seven day" time period Plaintiff references in his complaint,

medical records reflect that, in October 2009, Dr. Tesemma ordered

Plaintiff to be evaluated by urologist Dr. Alfred Newman after

Plaintiff exhibited an elevated PSA (also known as "prostate specific

antigen"), which, according to Defendant Dr. Barber, is "indicative

of potential prostate abnormalities, including potential prostate

cancer."  (Doc. 29, att. 1 at 2).  Medical records reflect that

Plaintiff was seen by Dr. Newman on November 4, 2009, at which time

Dr. Newman conducted a biopsy and ultrasound of Plaintiff's prostate.

(Doc. 29, att. 1 at 2; att. 3 at 11-12).  In a letter dated November

8

9, 2009, Dr. Newman advised Dr. Tesemma that the biopsies he had conducted indicated that Plaintiff did not have cancer.  (Doc. 29, att. 3 at 8).  However, pursuant to Dr. Newman's recommendations, Dr. Tesemma entered orders on November 9, 2009, providing for Plaintiff to follow up with Dr. Newman two months later.  (Doc. 29, att. 1 at 2; att. 3 at 7).

Plaintiff's medical records reflect that he did not request medical treatment again until December 8, 2009, when he complained of "stomach problems, fever and often trips to bathroom to defecate. Extreme nausea, dizziness, severe headaches, difficulty breathing, shortness of breath, lightheadedness."  (Doc. 29, att. 3 at 39). According to records, Plaintiff was evaluated by medical staff that very day and received medication for his symptoms.  (Id. at 40, 41). Plaintiff was next evaluated by the medical staff at Holman, just days later, on Saturday, December 12, 2009, when he complained of vomiting blood and swelling in his mouth and arms, as well as dizziness, diarrhea and pain when urinating.  (Id. at 37, 38).  As a result of these symptoms, Plaintiff was examined by Dr. Tesemma the following Monday, December 14, 2009, at which time Dr. Tesemma ordered that additional testing, including an abdominal x-ray and a colonoscopy for Plaintiff, be performed in an attempt to discern Plaintiff's medical problem.  (Doc. 29, att. 1 at 3; att. 3 at 48-49; att. 5 at 35).  Subsequently, on December 17, 2009, Dr. Tesemma

9

ordered Plaintiff to be transferred to a local hospital for treatment
of his vomiting and diarrhea.   (Doc. 29, att. 4 at 16; att. 6 at 47).

The medical treatment described in the previous two paragraphs
was just the beginning of numerous free world hospital visits, free
world specialist visits, as well as additional medical care in the
infirmary at Holman.   Plaintiff has been afforded medical exams,
diagnostic tests, x-rays, and treatments, as well as numerous
prescription medications.   (Doc. 29, atts. 2-7).

## II.   PROCEDURAL ASPECTS OF THE CASE

On December 7, 2011, Plaintiff filed the present § 1983
complaint in this Court.   (Doc. 1).   In his complaint, Plaintiff
seeks damages and injunctive relief against Defendants for delay in
providing medical treatment for forty-seven days, as well as for lack
of proper medical care thereafter, thereby violating his Eighth
Amendment right against cruel and unusual punishment.   (Doc. 1 at
17-18).

In the answer and special report filed on behalf of Defendants
on April 17, 2012,  Defendants deny Plaintiff's allegations and
assert various defenses, including sovereign and qualified
immunity.[1]   (Docs. 29, 30).   On May 22, 2012, the Court converted the

---

[1] The Court notes that, as private actors, the Defendants, CMS,
Tesemma, Judit, Barber, Hicks, Wilson, Myers, Poindexter, Griffin,
Carnley, and Taylor are not entitled to immunity, whether qualified
or absolute.  See Swann v. Southern Health Partners, Inc., 388 F.3d

answer and special report of the Defendants to a motion for summary
judgment. (Doc. 32).  On June 22, 2012, and on June 26, 2012,
Plaintiff filed responses in opposition to Defendants' motion for
summary judgment. (Docs. 37, 39).  The Defendants' motion for
summary judgment and Plaintiff's responses thereto are now before
the Court.

### III.  SUMMARY JUDGMENT STANDARD

In analyzing the propriety of a motion for summary judgment,
the Court begins with these basic principles.  The Federal Rules of
Civil Procedure grant this Court authority under Rule 56 to render
"judgment as a matter of law" to a party who moves for summary
judgment.  Federal Rule of Civil Procedure 56(a) provides that
"[t]he court shall grant summary judgment if the movant shows that
there is no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law."  In Celotex Corp. v.
Catrett, 477 U.S. 317, 322 (1986), the Supreme Court held that summary

---

834, 837 (11th Cir. 2004), overruled, in part, on other grounds ("The
parties agree that as a private entity, SHP [a private corporation
employed by the County to provide medical care to inmates at the
county jail] is not entitled to assert a qualified immunity
defense."); Hinson v. Edmond, 205 F.3d 1264, 1265 (11th Cir. 2000)
(a "privately employed prison physician" "is ineligible to advance
the defense of qualified immunity"); Edwards v. Alabama Dep't of
Corrections, 81 F. Supp. 2d 1242, 1254 (M.D. Ala. 2000) (a private
entity contracting with a state to provide medical services to state
inmates "is not entitled to qualified immunity...."). Similarly,
the Court is aware of no case extending absolute immunity to private
actors providing medical services to state inmates.

judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . ."  However, all of the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1280 (11th Cir. 2004).

Federal Rule of Civil Procedure 56(e) further provides:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate

the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-25.

Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. See Stabler v. Florida Van Lines, Inc., 2012 WL 32660, *5 (S.D. Ala. 2012) (unpublished) (citing Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991)). Summary judgment is proper when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." McDowell v. Brown, 392 F.3d 1283, 1288 (11th Cir. 2004) (citations and internal quotation marks omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted). "After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and

13

the moving party is entitled to judgment as a matter of law." <u>AGSouth Genetics, LLC v. Cunningham</u>, 2011 WL 1833016, *2 (S.D. Ala. 2011).

IV. DISCUSSION

As set forth above, Plaintiff alleges in his Complaint that Defendants violated his rights under the Eighth Amendment by delaying medical treatment for a period of forty-seven days for alleged side effects that he suffered as a result of medication prescribed by a doctor at a free world hospital in or around October 2009, and for providing inadequate medical treatment thereafter.  Specifically, Plaintiff alleges that he complained to Defendants about symptoms that he was experiencing following the administration of two prescription medications in October 2009, but he did not receive medical treatment for his symptoms until November 28, 2009.  (Doc. 1 at 9-10).  Plaintiff argues that the alleged forty-seven day delay in his medical treatment caused him to suffer additional health problems, and that this delay in treatment, along with the lack of adequate medical care following the delay, constitutes a violation of his rights under the Eighth Amendment.  For each of the reasons set forth below, Plaintiff's claim fails as a matter of law.

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  "The Eighth Amendment's proscription of cruel and unusual punishments prohibits

14

prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

Sims, 25 F.3d at 983 (citing Hudson v. McMillian, 503 U.S. 1, 8 (1992)). To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739 n. 9 (2002)). "In either of

these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need. Farrow, 320 F.3d at 1243. "Deliberate indifference" entails more than mere negligence. Estelle, 429 U.S. at 106; Farmer v. Brennan, 511 U.S. 825, 835 (1994).

> The Supreme Court clarified the "deliberate indifference" standard in Farmer by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety*; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting Farmer and Estelle, this Court explained in McElligott that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott, 182 F.3d at 1255; Taylor, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

Farrow, 320 F.3d at 1245-46 (emphasis in original).

"Delay in access to medical attention can violate the Eighth

16

Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." <u>Hill</u>, 40 F.3d at 1187 (internal citations and quotation marks omitted). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." <u>Id.</u>

> The "seriousness" of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. <u>Gaudreault</u>, 923 F.2d at 208; <u>Monmouth County</u>, 834 F.2d at 347. Where the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious." <u>Id.</u> An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. Further, we have held that "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay." <u>Harris v. Coweta County</u>, 21 F.3d 388, 393-94 (11th Cir. 1994) (emphasis added). Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

<u>Hill</u>, 40 F.3d at 1188-89 (emphasis in original) (footnotes omitted).

Further, "[i]t is well-established that a difference in opinion or a disagreement between an inmate and prison officials as to what medical care is appropriate for his particular condition does not

17

state a claim for deliberate indifference to medical needs." <u>Del Muro v. Federal Bureau of Prisons</u>, 2004 WL 1542216, *4 (N.D. Tex. 2004) (unpublished).  As to "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." <u>Adams v. Poag</u>, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting <u>Estelle</u>, 429 U.S. at 107).

The Court assumes, for purposes of the motion for summary judgment, that Plaintiff has endured an objectively serious medical need.  Therefore, the Court turns to the second, subjective element of Plaintiff's claim, that is, whether Defendants were deliberately indifferent to Plaintiff's serious medical need.

Plaintiff contends that after he was treated by Montgomery urologist Dr. Alfred Newman in October 2009, he suffered from side effects from medications administered to him by Dr. Newman.  (Doc. 1 at 9).  Plaintiff alleges that he was denied medical treatment for these side effects from October 2009 until November 28, 2009.  (<u>Id.</u> at 10).  Plaintiff claims that the side effects he suffered in October and November 2009 were nausea, muscle weakness, and fatigue and swelling in his arms and legs.  (<u>Id.</u> at 9).  He generally claims that throughout October and November, he went to the sick call window regarding his "deteriorating condition," but was denied treatment

until November 28, 2009.  (Id.).

Contrary to Plaintiff's allegations, the undisputed medical evidence shows that there was not a "forty-seven day" period of time from October until November 28, 2009 that Plaintiff was denied medical treatment.  (Doc. 29, att. 3 at 11-12, 37-41, 48-49; att. 4 at 16; att. 6 at 47).  Plaintiff does not deny the authenticity of the medical records submitted by Defendants in this matter and these records clearly reflect that Plaintiff did receive medical care during the "forty-seven day" time period when he alleges that he did not. See Scott v. Harris, 550 U.S. 372, 380 (2007)("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); Vicks v. Knight, 380 Fed. Appx. 847, 851 (11th Cir. 2010)(unpublished).

Plaintiff's own medical records reflect that he saw urologist Dr. Alfred Newman on November 4, 2009, and was then seen by Holman medical staff on December 8, 2009, the very first time, according to the records, Plaintiff requested medical care following his visit to the medical specialist in November.  (Doc. 29, att. 3 at 11-12, 39-41).  In fact, Plaintiff's medical records reflect that he received extensive medical care from October 2009 to the time of the filing of this lawsuit.  (Doc. 29, atts. 2-7).  The medical records

19

reflect that Plaintiff was examined numerous times by not only the medical staff, but also the doctors at Holman, who referred Plaintiff out to free world specialists as needed for medical care.  (Doc. 29, att. 2-7).  Furthermore, by Plaintiff's own account, he has seen free world specialists, Holman doctors and medical staff, been prescribed medications, and been afforded diagnostic tests and procedures. (Doc. 1 at 9-16).  "When a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation."  Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989).

It is Plaintiff's belief that his health problems involving his urethra and bladder have originated and been caused by the alleged delay in treatment of his allergic reaction or side effects from his medication for the time period of October and November 2009. However, even if there was a delay in medical care – which the medical records do not support- Plaintiff has offered no "verifying medical evidence" whatsoever that any alleged delay in medical treatment has caused any of Plaintiff's medical problems.  Hill, 40 F.3d at 1188-89.  In fact, medical records indicate that the cause of Plaintiff's urethral problem, known as a urethral stricture, "was likely secondary to some sexually transmitted disease contracted by [Plaintiff]."  (Doc. 29, att. 1 at 4, att. 6 at 54-55).

Considering all of the circumstances surrounding the medical treatment that Plaintiff received related to his medical problems

from October 2009, to the present date, the Court cannot say that any of the Defendants were deliberately indifferent to his serious medical needs.  Thus, Plaintiff has failed to establish the subjective element of his Eighth Amendment claim, and Defendants are entitled to summary judgment.

<u>V.   CONCLUSION</u>

Based on the foregoing, it is recommended that the motion for summary judgment of Defendants, CMS, Tesemma, Judit, Barber, Hicks, Wilson, Myers, Poindexter, Griffin, Carnley, and Taylor (Docs. 29, 30) be granted and that Plaintiff's action against these Defendants be dismissed with prejudice.  In addition, it is recommended that Plaintiff's pending motion for a preliminary injunction be denied as moot.  (Doc. 36).

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

DONE this 3rd day of July, 2012.

s/BERT W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE

21

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.   *Objection*.   Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to do so will bar a de novo determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. Unit B, 1982) (en banc).  The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days[2] after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

---

[2] Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]"  Fed. R. Civ. P. 72(b)(2).

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   ***Transcript (applicable Where Proceedings Tape Recorded).*** Pursuant to 28 U.S.C. § 1915 and FED. R. CIV. P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.