# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| LARRY ROY, etc., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION 11-0694-WS-M |
| | ) |
| CORRECTIONAL MEDICAL | ) |
| SERVICES, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER

This matter is before the Court on the motion for summary judgment filed by all remaining defendants. (Doc. 99). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 100-01, 107, 109-10, 114), and the motion is ripe for resolution. After careful consideration, the Court concludes that the motion is due to be granted.

## BACKGROUND

According to the verified complaint, (Doc. 1), the plaintiff at all relevant times has been an inmate at Holman Correctional Facility ("Holman"). The entity defendant ("CMS") provides medical services at Holman, and the individual defendants are or were medical providers employed by the entity defendant and working at Holman. Three of the individual defendants (Tesemma, Judit and Barber) are physicians. The remaining six individual defendants (Hicks, Wilson, Poindexter, Griffin, Carnley and Taylor) are nurses. The plaintiff alleges against each defendant a Section 1983 claim of deliberate indifference to a serious medical need in violation of the Eighth Amendment.

# DISCUSSION

In July 2012, the Magistrate Judge issued a report and recommendation ("R&R") that the defendants' motion for summary judgment be granted for lack of a constitutional violation and that the plaintiff's motion for preliminary injunction, (Doc. 36), be denied as moot. (Doc. 40). The Court adopted the R&R, dismissed the complaint with prejudice, and entered judgment accordingly. (Docs. 42, 43). The Eleventh Circuit affirmed in part, reversed in part, and remanded for further proceedings. (Doc. 59). On remand, the Magistrate Judge appointed learned counsel for the plaintiff, (Doc. 65), who has represented the plaintiff throughout discovery and motion practice.

## I. Allegations of the Complaint.

According to the complaint, the plaintiff was seen by a free-world urologist (Dr. Newman) in October 2009, who prescribed medications for enlarged prostate. The plaintiff experienced serious side effects from the medications, of which Nurse Taylor was informed, but she did nothing for 47 days. In late November, when a guard brought the plaintiff – displaying obvious symptoms – to Nurse Taylor, she finally made him an appointment with Dr. Tesemma – for mid-December. On December 17, Dr. Tesemma saw the plaintiff, with severe weight loss and other obvious symptoms, and decided the plaintiff could wait two more weeks to see a urologist. The plaintiff's family prevailed upon the warden to permit the plaintiff to visit an emergency room that night, and the ER doctor announced the plaintiff's organs were failing and that he likely would have died had he not come in when he did. (Doc. 1 at 9-11).

On appeal, the Eleventh Circuit found that the plaintiff was prescribed the medications on November 4, 2009, and it found that the defendants' response, through and including December 17, 2009, did not reflect deliberate indifference to a serious medical need. (Doc. 59 at 4, 7). The Eleventh Circuit thus affirmed

the grant of summary judgment as to this portion of the plaintiff's claim. (*Id*. at 10).

According to the complaint, the free-world surgeon (Dr. Paul) the plaintiff saw on December 18, 2009 inserted an in-dwelling catheter to enable the plaintiff to urinate freely. Dr. Paul instructed that he personally would remove the catheter after seven weeks. Instead, on February 1, 2010, Wilson removed the catheter, and then she and Poindexter attempted unsuccessfully to insert a new catheter. The plaintiff was then taken to a free-world hospital on February 2, where a free-world doctor botched the job. On February 3, the plaintiff was taken to another free-world hospital, where Dr. Newman inserted a flexible, effective catheter. On March 3, 2010, Dr. Newman performed microwave surgery and inserted a new catheter. (Doc. 1 at 11-13).

According to the complaint, Dr. Newman instructed that the catheter be changed on or about April 14, 2010. On April 14, Nurses Griffin and Carnley removed the catheter and attempted to insert a new one but could not get it past the site of the microwave surgery. They opened the balloon tip anyway, causing excruciating pain, and blood (but not urine) flowed into the urine bag. Griffin and Carnley returned the plaintiff to his cell in this condition. The plaintiff returned to the infirmary and complained to Nurses Hicks and Griffin, who sent him back to his cell. A guard returned the plaintiff to the infirmary, where Dr. Judit removed the catheter, removed clots of blood from the tip, and re-inserted the catheter. Again, the catheter stopped at the site of the microwave surgery, Dr. Judit inflated the balloon anyway, and again pain and blood was the result. The three defendants handled other items while trying to insert the catheter, and the plaintiff suffered a urinary tract infection as a result. In addition, the plaintiff's abdomen swelled with pressure from being unable to urinate all day, several organs became infected and excruciatingly painful, and he could smell and taste urine in his saliva. The plaintiff was taken to a free-world emergency room, where he received antibiotics and a new catheter. (Doc. 1 at 13-14).

According to the complaint, the plaintiff notified Dr. Barber, on or about September 25, 2011, of symptoms of a urinary tract infection, including foul-smelling, dark-colored urine and a clear yellow secretion with stringy features. On October 7, 2011, the plaintiff informed Dr. Barber that his kidneys and liver were hurting and that his catheter, which had been inserted on June 15, 2011, needed to be changed because it would periodically stop up. Dr. Barber did nothing, and the catheter became blocked solid. On October 14, 2011, Dr. Barber instructed a nurse to change the catheter, which she did. (Doc. 1 at 15-16).

In reversing and remanding in part, the Eleventh Circuit relied on evidence that the plaintiff supplied in opposition to the defendants' motion for summary judgment. (Docs. 36, 37, 39). The appellate court noted evidence that Dr. Newman had directed prison staff to change the plaintiff's catheter every four weeks and that the plaintiff had repeatedly experienced delays of up to 15 weeks in having his catheter changed. (Doc. 59 at 8). The Eleventh Circuit "conclude[d] that an issue of fact is presented as to whether CMS's failure to regularly provide Roy with catheter treatment pursuant to Dr. Newman's orders displayed deliberate indifference to Roy's serious medical need." (*Id.* at 9).

On remand, no viable issue is presented in this regard, because the complaint alleges only a single, narrow issue concerning delay in changing the plaintiff's catheter.[1] Following remand, the plaintiff was given several months to seek leave to amend his complaint. (Doc. 73 at 2). He never did so, leaving his original complaint as the operative pleading. As the defendants note, (Doc. 114 at 10 n.6), "[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with [Rule 15(a)]. A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315

---

[1] This is the one-week delay in changing his catheter, from October 7 to October 14, 2011. (Doc. 1 at 15-16).

4

(11th Cir. 2004). Actually, the plaintiff does not argue in brief that any more extensive claim regarding delay in changing his catheter is part of this case. Nor does he cite to, or rely upon, the evidence of delay in changing his catheter on which the Eleventh Circuit relied. (Doc. 107 (relying on only the complaint and the plaintiff's declaration)).

**II. Summary Judgment Procedure.**

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to

summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[2] Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

## III. Governing Law.

"[W]e have held repugnant to the Eighth Amendment punishments … which involve the unnecessary and wanton infliction of pain …." *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (internal quotes omitted). "We … conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain … proscribed by the Eighth Amendment." *Id*. at 104.

---

[2] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

"The Eighth Amendment's prohibition against 'cruel and unusual punishments' protects a prisoner from deliberate indifference to serious medical needs." *Kuhne v. Florida Department of Corrections*, 745 F.3d 1091, 1094 (11th Cir. 2014). "To prevail on a deliberate indifference to serious medical need claim, Plaintiffs must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser International, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).

As to the first element, "[a] serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mann*, 588 F.3d at 1307 (internal quotes omitted). "In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition." *Id*. "In either case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Id*. (internal quotes omitted).

The Eleventh Circuit identified the plaintiff's diagnosed conditions as "an enlarged prostate, a distended bladder, frequent urethral strictures and bladder outlet obstructions, Giardiasis, and urinary tract infections." (Doc. 59 at 3). The appellate court then stated that, "given the various diagnoses discussed above," the defendants could not contest the Court's assumption that the plaintiff "has endured an objectively serious medical need." (*Id*. at 8). Although these conditions are not all in play during the episodes on which the complaint is based, the defendants do not argue that the plaintiff at any relevant time had no serious medical need.

To satisfy the second element, a plaintiff "must show: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence." *Mann*, 588 F.3d at 1307 (internal quotes omitted).

As to the first prong of this second element, the degree of risk must be "substantial." *E.g., Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011). To have subjective knowledge of such a risk, the defendant "must both be aware of

facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rodriguez v. Secretary for Department of Corrections*, 508 F.3d 611, 617 (11th Cir. 2007) (internal quotes omitted). "[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual Defendant must be judged separately and on the basis of what that person knows." *Harper v. Lawrence County*, 592 F.2d 1227, 1234 (11th Cir. 2010) (internal quotes omitted).

As to the second prong of the second element, one "disregards that risk [of serious harm] by failing to take reasonable measures to abate it." *Chandler v. Crosby*, 379 F.3d 1278, 1296 (11th Cir. 2004) (internal quotes omitted); *accord Harper*, 592 F.3d at 1235.

As to the third prong of the second element, the defendant's response must be "poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Bingham*, 654 F.3d at 1176.

"Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours …." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). However, "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1189 (11th Cir. 1994). Moreover, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Id*. at 1188.

**IV. Analysis.**

   **A. Doctor Tesemma.**

The only allegations of the complaint against Dr. Tesemma involve events culminating on December 17, 2011. (Doc. 1 at 9-11). As noted, the Eleventh Circuit has affirmed the Court's grant of summary judgment as to those allegations. As the defendants correctly point out, (Doc. 101 at 41), there is thus no remaining claim in this action against Dr. Tesemma.

In his declaration and brief, the plaintiff asserts that, on December 31, 2009, the Holman nursing staff attempted to give him one of the medications to which Dr. Newman had found he was allergic, and that they did so because Dr. Tesemma had not entered the plaintiff's allergies into his medical record. (Doc. 109 at 2; Doc. 110 at 1). As discussed in Part I, the complaint's failure to assert any claim against Dr. Tesemma concerning a failure to properly notate the plaintiff's medical records means there is no such claim in this lawsuit. The plaintiff concedes that liability cannot be based on events preceding December 21, 2009. (Doc. 122 at 2).

   **B. Doctor Judit.**

The only allegations against Dr. Judit concern the events of April 14, 2010. (Doc. 1 at 13-14). The plaintiff's declaration establishes that he had no contact with Dr. Judit until 4:00 p.m. (Doc. 109 at 6). The plaintiff told Dr. Judit he had inflated the catheter tip in the surgery area and noted that the urine bag had no urine, only blood. Dr. Judit responded, "I'm the doctor." (*Id.*). The medical records, which the plaintiff does not dispute, reflect that Dr. Judit advised the plaintiff that, if urine did not flow or he experienced pain in the hypogastric area,[3] he should return to the health care unit "right away" and that he would be sent to

---

[3] The term refers to "[t]he lowest of the three median regions of the abdomen." American Heritage Dictionary 867 (5th ed. 2011).

9

an emergency room "ASAP." (Doc. 100-1 at 118). The medical records also reflect that the plaintiff presented back at the window at 6:30 p.m. and was promptly sent to North Baldwin Hospital; by 8:00 the next morning, he was back at Holman, with a catheter inserted. (*Id*. at 107, 119, 145).[4]

The defendants argue that the plaintiff has no evidence that Dr. Judit was deliberately indifferent to any serious medical need. (Doc. 114 at 10-11). The plaintiff argues that the incident reflects the "unnecessary and wanton infliction of pain." In support, he points out that, when he told Dr. Judit the catheter tip was in the wrong spot, Dr. Judit responded, "I'm the doctor," inflated the balloon tip, and sent the plaintiff back to his dorm in "intense pain." (Doc. 110 at 10, 17).

Dr. Judit is in fact a doctor, and the plaintiff is not a doctor. The plaintiff has not explained why the doctor should defer to the patient in determining whether a catheter has reached the bladder, or how a doctor could be deliberately indifferent to a substantial risk of serious harm by relying on his training and experience rather than on a lay patient's assertion that the doctor is wrong. That the plaintiff pointed out blood in the urine bag changes nothing, because the evidence reflects it was not uncommon for blood to be discharged into the bag upon a catheter being properly inserted, including by free-world medical personnel. (Doc. 100-1 at 95, 105, 107, 119).

As for the plaintiff being in "intense pain," there is no record evidence of this. The complaint says only that "it was painful," (Doc. 1 at 14), and the declaration says nothing at all. Moreover, while the plaintiff in brief asserts that he "told them [Dr. Judit and Nurses Griffin and Carnley] they were hurting him," (Doc. 110 at 17), there is no record evidence that he told Dr. Judit he was experiencing any pain after Dr. Judit inflated the balloon tip; both the complaint

---

[4] The plaintiff admits he was transported to the ER about 8:00 p.m. and had a new catheter inserted about 3:30 a.m. on April 15. (Doc. 109 at 6).

10

and the declaration are silent on this score.[5] Dr. Judit could not have ignored a complaint of pain that was never made.

Moreover, it is uncontroverted that Dr. Judit told the plaintiff to return to the health care unit immediately if he did not discharge urine or if he experienced lower abdominal pain and that he would be transported forthwith to an emergency room. Such instructions (which the plaintiff followed, resulting in immediate transport to hospital) are inconsistent with a wanton infliction of pain.

**C. Dr. Barber.**

The only allegations against Dr. Barber concern the events of September 25 to October 14, 2011.[6] (Doc. 1 at 15-16). On September 25, the plaintiff described symptoms of a urinary tract infection. (*Id*. at 15). The record establishes, and the plaintiff admits, that Dr. Barber prescribed an antibiotic for the infection the very same day. (Doc. 100-1 at 138; Doc. 100-8 at 103-04). The plan established by Dr. Barber on September 25 called for treating the infection with antibiotic for 14 days and then having the catheter changed by Dr. Newman. (*Id*. at 108).

On October 7, 2011, the plaintiff informed Dr. Barber that his catheter needed to be changed because it would periodically stop up and that his kidneys and liver were hurting (which the plaintiff attributed to urine backing up). (Doc. 1 at 15). The complaint asserts that Dr. Barber "did nothing" in response to this report, but in his deposition the plaintiff admits that Dr. Barber on September 27 had already referred him to Dr. Newman "to change out Foley catheter." (Doc. 100-1 at 138; Doc. 100-8 at 173). Moreover, the plaintiff admits he requested that

---

[5] Even when the plaintiff returned at 6:30 and was transported to the ER, his complaint was not pain but inability to urinate. (Doc. 100-1 at 107).

[6] Although the plaintiff in his deposition raised other objections to Dr. Barber's care, (Doc. 101 at 41-42), he confirms in his brief that his case is limited to the incidents described in the complaint. (Doc. 110 at 10-11). As discussed in Part I, the plaintiff could not effectively expand his claims except by amending his complaint, which he never did.

11

Dr. Newman change the catheter and that the Holman medical staff "was unable to replace my catheter." (Doc. 100-4 at 10; Doc. 109 at 8). Finally, the plaintiff admits that his catheter worked throughout the period of September 25 to October 14, 2011. (Doc. 100-8 at 111).

When, on October 14, before the plaintiff's October 19 appointment with Dr. Newman, the plaintiff reported that the catheter had become "blocked solid" and flushing the catheter did not work, Dr. Barber immediately ordered that the catheter be changed, and it was. (Doc. 1 at 15-16; Doc. 100-1 at 11, 137).

The plaintiff argues that Dr. Barber "simply ignored his calls for help" and that "[n]othing happened" in response to his complaints. (Doc. 110 at 10-11). This assertion in brief, unsupported by any citation to the record, is conclusively refuted by that record, as set forth above.

The plaintiff also argues that Dr. Barber impermissibly delayed in treating him. (Doc. 110 at 16). With respect to the September 25 and October 14 incidents, the suggestion is facially untenable, since the plaintiff received immediate treatment. As for the October 7 incident, the delay in changing the plaintiff's catheter was only seven days, his catheter worked fine in the interim, it was not changed earlier because of his urinary tract infection and because he had asked that Dr. Newman change the catheter, and the plaintiff identifies no evidence that his condition deteriorated in any way as a result of having his catheter changed on October 14 rather than October 7. The two cases relied upon by the plaintiff, (Doc. 110 at 2-3) – which involved delays of 15 months and 20 months, respectively – do not support an inference that the brief delay in this case rises to the level of a constitutional violation.

**D. Nurse Hicks.**

The only allegations against Nurse Hicks concern the events of April 14, 2010. After Nurses Griffin and Carnley inserted a new catheter and returned the plaintiff to his cell, he "returned to the infirmary, and complained to [Hicks and

12

Griffin] – both of whom were deliberately indifferent and they sent plaintiff back to his cell." (Doc. 1 at 13). The plaintiff's declaration adds that, around 2:00 p.m., he "was in considerable pain and went to get help at the medical window in the main hall, where Nurse Hicks and Nurse Griffin did nothing but tell me to come back at 7:30 p.m." (Doc. 109 at 6). Notably absent from the plaintiff's evidence is any indication that he told Hicks or Griffin what his issue was or that he was in "considerable pain," much less that he was in such pain he could not wait until 7:30.

As with Dr. Barber, the plaintiff argues that Hicks is liable under a delay-in-treatment theory. (Doc. 110 at 17). Independently fatal is the absence of evidence that Hicks or Griffin were given any clue why the plaintiff wanted attention. But even were there such evidence, the plaintiff's argument would fail. The delay was only two hours,[7] the condition apparently was only moderate pain, and there is no evidence or even allegation that the brief delay worsened the plaintiff's condition.

In his brief and his declaration, the plaintiff complains that, when he filed a medical grievance in February 2010, Nurse Hicks told him she had thrown it in the trash. (Doc. 109 at 3; Doc. 110 at 11). As discussed in Part I, because there is no such claim in the complaint, there is no such claim in this action.

### E. Nurses Wilson and Poindexter.

The only allegations against Nurses Wilson and Poindexter concern the events of February 1-3, 2010. The plaintiff "does not wish to pursue those defendants," and "he consents to the entry of judgment in favor of" them. (Doc. 107 at 1; Doc. 110 at 8).

---

[7] Dr. Judit saw the plaintiff at about 4:00 p.m. (Doc. 100-1 at 107, 118; Doc. 109 at 6).

13

**F. Nurse Taylor.**

The only allegations against Nurse Taylor concern the events preceding December 17, 2009. (Doc. 1 at 9-10). As discussed in Part IV.A, the Eleventh Circuit has affirmed the Court's grant of summary judgment as to those allegations. As the defendants point out, (Doc. 101 at 41), there is thus no remaining claim in this action against Nurse Taylor.

In his declaration and brief, the plaintiff asserts that, in July 2014, Taylor removed his catheter very forcefully and rapidly, with the intent of inflicting pain. (Doc. 109 at 5; Doc. 110 at 12). As stated in Part I, a plaintiff cannot inject new claims in a lawsuit by raising them in opposition to summary judgment but must properly amend the complaint. The plaintiff has never attempted to do so. Accordingly, and as the defendants insist, (Doc. 114 at 14), there is no claim in this lawsuit regarding the events of July 2014. The plaintiff agrees. (Doc. 122 at 6).

**G. Nurses Griffin and Carnley.**

The only allegations against Nurses Griffin and Carnley concern the events of April 14, 2010. (Doc. 100-8 at 154). The plaintiff's complaint and declaration relate that Griffin and Carnley removed the plaintiff's catheter and inserted a new one, that it would not insert past his recent surgery point, that he told them the tip was in the surgery area, that they inflated the balloon tip anyway, that this caused him pain (or excruciating pain), that he pointed out to them that there was blood but no urine in the urine bag, and that they sent him back to his cell in this condition. (Doc. 1 at 13; Doc. 109 at 6).

As with Dr. Judit, the plaintiff relies on an "unnecessary and wanton infliction of pain" theory. (Doc. 110 at 17). As with Dr. Judit, however, the plaintiff fails to explain how medical personnel could be deliberately indifferent by trusting their training and experience rather than a lay patient's insistence they were doing it wrong. Again, the evidence reflects that blood in the urine bag is not

14

unusual upon proper insertion of a catheter, and again there is no evidence the plaintiff told the nurses he was in pain. Even were the plaintiff's testimony that he "began painfully telling them that the tip was in the surgery area," (Doc. 109 at 6), to be generously construed as indicating he told them he was in pain (as opposed to denoting only that he spoke while in pain), there is no evidence that he quantified the pain to an extent that would distinguish his situation from the pain that would ordinarily (and thus necessarily) be felt upon insertion of a catheter, especially one that must contact a surgical area.

To the extent the plaintiff accuses Griffin of deliberate indifference upon his return to the infirmary on the afternoon of April 14, (Doc. 1 at 13), the claim fails for reasons set forth in Part IV.D.

### H. CMS.

CMS "is a private entity that provides medical services to prisoners in [the State of Alabama's] place, and so it can be held liable only if it had a custom or policy that constituted deliberate indifference to [a] constitutional right." *Fields v. Corizon Health, Inc.*, 490 Fed. Appx. 174, 182 (11th Cir. 2012) (internal quotes omitted). The plaintiff says his evidence of such a policy is the "uniform conduct of the defendant physicians," plus the "content and tenor" of the affidavit of Dr. Hood, CMS's regional medical director. This evidence, he says, reflects a "corporate policy" of "ignoring Mr. Roy's serious medical needs to save corporate money." (Doc. 110 at 12). It is doubtful that the few incidents involving Doctors Tesemma, Judit and Barber, even had they been shown to violate the Eighth Amendment, would suffice to show a corporate policy of deliberate indifference to serious medical needs, and the plaintiff has not explained how Dr. Hood's affidavit could serve as a substitute. But the plaintiff's more fundamental difficulty is that, as set forth in Parts IV.A-.G, he has no viable claim of a constitutional violation at all, and without such a violation there can be no entity liability for the violation. *See, e.g., City of Canton v. Harris*, 489 U.S. 378, 385

(1989) ("[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue.") (emphasis omitted).

**CONCLUSION**

For the reasons set forth above, the defendants' motion for summary judgment is **granted**. All claims against the defendants are **dismissed with prejudice**. Judgment shall be entered accordingly by separate order.[8]

DONE and ORDERED this 15th day of October, 2014.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[8] The plaintiff's motion to strike, (Doc. 108), is **denied as moot**, as the Court has not relied on any of the materials made the basis of the motion. The defendants' motion to strike, (Doc. 116), is **denied**, as the proper response to evidence and briefs that: (1) seek to resurrect previously dismissed claims; (2) contradict the plaintiff's deposition; or (3) introduce claims beyond those in the complaint is to discount such materials, not to strike them from the record.

The plaintiff's motion for preliminary injunction, (Doc. 36), which was re-instated by the Eleventh Circuit, (Doc. 59 at 10), is **denied** in light of the dismissal of all of the plaintiff's claims.